**KENNEDY FOR PRESIDENT COMMITTEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

American Broadcasting Companies, Inc., CBS Inc., National Broadcasting Company, Inc., and Public Broadcasting Service, Intervenors.

No. 80-1482.

United States Court of Appeals, District of Columbia Circuit.

Argued May 30, 1980.

Decided May 31, 1980.

Opinion Aug. 6, 1980.

---

**24.** See id.

See also D.C.Cir., 636 F.2d 432.

Joseph F. Hennessey, Washington, D. C., with whom John E. Nolan, Jr., and William C. Oldaker, Washington, D. C., were on brief, for petitioner.

David J. Saylor, Deputy Gen. Counsel, F.C.C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Clifford G. Pash, Jr., and Lisa B. Margolis, Counsel, F.C.C., Sanford M. Litvak, Asst. Atty. Gen., Barry Grossman and Nancy C. Garrison, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.

Jerome J. Shestack, Philadelphia, Pa., with whom Bernard G. Segal, Philadelphia, Pa., Stephen A. Sharp, Washington, D. C., Corydon B. Dunham, New York City, and Howard Monderer, Washington, D. C., were on brief, for intervenor National Broadcasting Company, Inc.

James A. McKenna, Jr., Thomas N. Frohock and Carl R. Ramey, Washington, D. C., were on brief for intervenor American Broadcasting Companies, Inc.

J. Roger Wollenberg, Timothy B. Dyk and Michael S. Schooler, Washington, D. C., were on brief for intervenor CBS Inc.

Gene A. Bechtel, Theodore D. Frank, Mania K. Baghdadi and Eric H. Smith, Washington, D. C., were on brief for intervenor Public Broadcasting Service.

Before ROBINSON, MacKINNON and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This controversy arose when, on February 13, 1980, President Carter held a press conference carried live in prime time by the four major American television networks.[1] On the day following, petitioner Kennedy for President Committee complained to the networks that the President had taken advantage of the occasion for purposes of his candidacy for the 1980 presidential nomination of the Democratic party.[2] Petitioner

---

1. The networks, intervenors in this court, are American Broadcasting Companies, Inc. (ABC); CBS Inc. (CBS); National Broadcasting Company, Inc. (NBC); and Public Broadcasting Service (PBS).

2. Joint Appendix (J.App.) 26; Brief for Respondent at 4. A transcript of the press conference has been lodged with us. We note, however, that no recording of the conference was placed in the administrative record, and for reasons to

asked for "an equal opportunity" for its candidate, Senator Edward M. Kennedy, "to respond to ... calculated and damaging statements" allegedly made by the President "and to provide contrasting viewpoints...."[3] Each of the networks responded negatively, whereupon petitioner turned to the Federal Communications Commission for assistance. On March 7, that agency's Broadcast Bureau denied petitioner's request,[4] and on May 6, by the order now under review, the Commission sustained the Bureau's ruling.[5]

Petitioner challenges the Commission's decision on several grounds. Foremost are contentions that the Commission abdicated a duty to apply the equal–opportunity mandate of Section 315(a) of the Communications Act of 1934,[6] and ignored an independent responsibility to accord First Amendment considerations their just due. The Commission, on the other hand, insists that its action kept faith with principles of Section 315(a) interpretation formulated in its *Aspen* decision[7] and approved by this court,[8] and that its disposition furthered the common objective of Section 315(a) and the First Amendment by encouraging maximal coverage of events envisioned by the networks as newsworthy. We agree with the Commission and affirm.[9]

## I. BACKGROUND

The press conference precipitating this litigation transpired on the eve of the 1980 presidential primary in New Hampshire. Petitioner charges that the conference was staged as an integral part of President Carter's so–called "Rose Garden" campaign strategy.[10] During the course of the telecast, the President was asked four questions regarding his candidacy for the Democratic presidential nomination and that of Senator Kennedy, his principal rival.[11] In its protest to the networks, petitioner predicated its equal–opportunity demand on allegedly "distorted and inaccurate statements" by the President in response to queries "about Senator Kennedy's views on a number of

---

be elucidated later the content of the conference is not a factor in our decision. See Part II–B–4 *infra.*

3. Brief for Respondent at 4, quoting letter from Stephen E. Smith, on behalf of petitioner, to the networks (Feb. 14, 1980).

4. Letter Ruling (F.C.C. Broadcast Bureau, No. 30175, Mar. 7, 1980), J.App. 8 [hereinafter cited as *Bureau Opinion*].

5. *Kennedy For President Comm.*, F.C.C. Docket No. 80–278 (May 6, 1980). J.App. 1 [hereinafter cited as *Commission Opinion*].

6. As amended, 47 U.S.C. § 315(a) (1976), quoted *infra* note 29.

7. *Aspen Inst. Program on Communications & Soc'y (Aspen)*, 55 F.C.C.2d 697 (1975), *aff'd sub nom. Chisholm v. FCC*, 176 U.S.App.D.C. 1, 538 F.2d 349, *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).

8. See note 7 *supra.*

9. Because the last of the 1980 presidential primaries were imminent, we announced our decision on May 31, 1980, the day after oral argument, stating that our opinion would follow. We now articulate our reasons.

10. Brief for Petitioner at 7. As explained by the Commission, this was a "strategy by which the President [had] foregone campaign appearances...." *Commission Opinion, supra* note 5, at 1, J.App. 1. Petitioner also characterizes the press conference as "Presidential media manipulation," Reply Brief for Petitioner at 10, and in support relies upon an article by Martin Schram appearing in the *Washington Post* on February 14, 1980, which similarly treated the conference as a campaign step. See Schram, *Carter Moves to Blunt Kennedy No–Campaign Charge*, Washington Post, Feb. 14, 1980, § A, at 2, col. 1. In much the same vein, petitioner cites Martin Faunke in the *Providence Journal* on the same date, reporting that WJAR (TV) in Providence, Rhode Island, had cut short the telecast of the conference because its general manager felt that the latter portion was addressed to campaign issues rather than "an international statement of importance that concerned all of our viewers in this area." See Providence Journal, Feb. 14, 1980, § A, at 3, col. 4.

11. Brief for Intervenors at 4. See note 2 *supra.*

issues." [12] In turning petitioner down, each network maintained that the telecast of the conference was free of Section 315(a)'s equal–opportunity obligation because it was an activity within that section's Exemption 4 for "[o]n–the–spot coverage of bona fide news events." [13]

■ Petitioner then urged the Commission "to rule that President Carter's News Conference of February 13 constituted a 'use' of television facilities offered by the major networks and to direct the networks to afford equal time [14] to Senator Kennedy...." [15] Petitioner claimed that the President had "devoted more than five minutes ... to a direct attack upon Senator Kennedy," [16] with the consequence that "millions of viewers were misinformed about Senator Kennedy's views on national and international issues critical to voters in the campaign for the presidential nomination." [17]

The Commission's Broadcast Bureau denied petitioner's request, primarily in reliance upon the Commission's *Aspen* decision,[18] affirmed by this court in *Chisholm v. FCC.*[19] The Bureau concluded that the telecast fell within *Aspen's* holding that press conferences featuring political candidates are exempt from Section 315(a)'s equal–opportunity requirement as "on–the–spot cov-

---

**12.** Letter from John E. Nolan Jr., William C. Oldaker and Joseph F. Hennessey, on behalf of petitioner, to William J. Tricarico, Secretary of the Commission (Feb. 26, 1980), J.App. 13 [hereafter cited as Equal Opportunity Request].

**13.** See Letter from Alan H. Gerson, Vice President, Compliance and Practices, NBC, Inc., to Stephen E. Smith, Campaign Manager, Kennedy for President Committee (Feb. 15, 1980), J.App. 24; Letter from Richard C. Wald, Senior Vice President, ABC News, to Stephen E. Smith (Feb. 15, 1980), J.App. 25; Letter from Bill Leonard, CBS News, to Stephen E. Smith (Feb. 15, 1980), J.App. 26; Telegram from Lawrence K. Grossman, President, PBS, to Stephen E. Smith (Feb. 21, 1980), J.App. 28.

Each network also asserted that it had provided extensive coverage of Senator Kennedy's campaign, and had fully presented his views on controversial issues in the course of news and public affairs programming. Three networks pointed out that they had offered the Senator timely opportunities in other television fora to reply to statements by the President. CBS had televised Senator Kennedy's response to the press conference on its news programs, PBS had invited him to appear on its McNeal/Lehrer Report, and NBC had proposed an appearance on its "Today" program on the morning after the conference. *Commission Opinion, supra* note 5, at 2 n.2, J.App. 2 n.2. See letters cited *supra.*

**14.** The phrases "equal time" and "equal opportunity" are often used interchangeably. The latter is employed in the statute, see 47 U.S.C. § 315(a) (1976), and is the more accurate of the two. A broadcaster's obligations under § 315(a) extend beyond providing an equal amount of time for the use of rival candidates to such things as availability of the responsive broadcast, be made available at an equal rate, and at a comparable hour of the day. See *The Law of Political Broadcasting and Cablecasting*, 69 F.C.C.2d 2209, 2216, 2260–2262 (1978).

Though, literally, § 315(a) makes its exaction only for use of a "broadcasting station," the Commission has long held that a candidate may demand equal opportunities from a network presenting his opponent instead of looking to each individual station. *Senator Eugene J. McCarthy*, 11 F.C.C.2d 511 n.1 (1968). See also *CBS v. FCC*, 629 F.2d 1, at 26–27 (D.C.Cir.1980) (construing 47 U.S.C. § 312(a) (7) (1976)). ˙˙

**15.** Equal Opportunity Request, *supra* note 12, at 1, J.App. 13.

**16.** *Commission Opinion, supra* note 5, at 1, J.App. 1.

**17.** *Id.* Petitioner did not invoke the well-known fairness doctrine. Compare *Kennedy for President Comm. v. FCC (Kennedy II)*, No. 80–1549 (D.C.Cir. Aug. 6, 1980), at pt. III; see discussion in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 375–400, 89 S.Ct. 1794, 1798–1812, 23 L.Ed.2d 371, 380–395 (1969). Aside from its constitutional claims, see Part III, *infra*, petitioner relied exclusively on the equal–opportunity provision of § 315(a). The Commission addressed petitioner's complaint solely on these two grounds, and so do we. See *e. g., D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n*, 151 U.S. App.D.C. 223, 242–243, 466 F.2d 394, 413–414, *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); *Democratic Nat'l Comm. v. FCC*, 148 U.S.App.D.C. 383, 403, 460 F.2d 891, 911, *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); *Green v. FCC*, 144 U.S.App. D.C. 353, 389, 447 F.2d 323, 359 (1971).

**18.** *Supra* note 7.

**19.** *Supra* note 7.

erage of bona fide news events."[20] The Bureau felt that under *Aspen* the regulatory role in equal–opportunity proceedings is confined to determining "whether or not the broadcaster intends to promote the interest of a particular candidate in presenting coverage of a news event."[21] Noting that petitioner had presented no evidence that the networks were not exercising good faith journalistic judgment in appraising the President's press conference as newsworthy, and detecting no indication of a purpose to favor the President's candidacy over the Senator's by televising the event,[22] the Bureau rejected petitioner's plea for an order providing an opportunity to respond. The Bureau acknowledged that an incumbent President "may well have an advantage over his opponent in attracting media coverage," but declared that "absent strong evidence that broadcasters were not exercising their bona fide news judgment, the Commission will not interfere with such judgments."[23] "Senator Kennedy was free," the Bureau observed, "to hold a press conference the next day or evening to rebut the President's charges."[24]

Four weeks later, on April 2, petitioner sought re–examination of the Bureau's ruling by the Commission. On May 6, the Commission denied petitioner's application for review.[25] Since we later draw directly and heavily on the Commission's opinion, it suffices for now merely to say that essentially the Commission tracked the Bureau's reasoning, and ultimately adhered pivotally to its *Aspen* holding that "so long as a covered event is considered newsworthy in the good faith judgment of the broadcaster," it is encompassed by one or more of Section 315(a)'s exemptions from the duty to afford equal opportunity.[26] It is the Commission's ensuing order that petitioner now brings before us.

Petitioner challenges the Commission's decision on the basis of its construction and application of Section 315(a) and on grounds attributed to the First Amendment. Within these broad categories, petitioner argues that there were factual and analytical flaws in the Commission's handling of constitutional, statutory and policy aspects of the controversy. We turn first to an examination of Section 315(a) and the Commission's treatment of the statutory issues.[27] We then address the First Amendment questions raised by petitioner.[28]

## II. THE SECTION 315(a) CLAIM

### A. *General Considerations*

Section 315(a) specifies broadly that "[i]f any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station."[29] "Equal opportuni-

---

**20.** *Bureau Opinion, supra* note 4, at 2, J.App. 9.

**21.** *Id.* at 3–4, J.App. 10–11 (citations omitted).

**22.** *Id.* at 4–5, J.App. 11–12.

**23.** *Id.* at 4–5, J.App. 11–12.

**24.** *Id.* at 4, J.App. 11.

**25.** *Commission Opinion, supra* note 5. See note 82 *infra*.

**26.** *Id.* at 4, J.App. 4.

**27.** See Part II *infra*.

**28.** See Part III *infra*.

**29.** As amended, Section 315(a) provides:

 If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such

candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide newscast,

(2) bona fide news interview,

(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on–the–spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto), shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in

ties" is manifestly a comprehensive term, and the Commission has given it rather full sway.[30] Four types of programming, however, are statutorily deemed nonuses of a broadcasting station, and thus are exempted from this requirement.[31] One–embraced by Exemption 4–immunizes the "[a]ppearance by a legally qualified candidate on any ... on–the–spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto)." [32] This provision, in the Commission's view, relieved the networks of any equal–opportunity obligation consequent upon the telecasts of the President's February 13 press conference.[33]

The question, then, is whether the Commission properly extended Exemption 4 to that conference, and in answering we do not write on a completely clean slate. For more than two decades after enactment of Section 315(a)'s exemptions, the Commission read them as applicable only when the candidate's appearance was not the central focus of the broadcast program but was merely incidental to an event independently and already newsworthy.[34] In 1964, when the Commission handed down its first ruling on candidates' press conferences, it concluded that they were not excepted from the call for equal opportunity.[35] In *Aspen* [36] in 1975, however, the Commission re-

versed its position, overruled the entire line of precedents the original approach had bred, and held that candidates' press conferences were encompassed by Exemption 4; [37] and our decision in *Chisholm* [38] sustained the Commission on all points.[39] The only inquiry now in order is whether there was anything so peculiar about the February 13 presidential press conference as to remove it from the ambit of *Aspen* and *Chisholm*.

In *Aspen*, the Commission satisfied itself that its prior interpretation of Section 315(a) was based upon an erroneous reading of the legislative history of the 1959 amendments creating the four exemptions from the pre–existing equal–opportunity mandate.[40] Those amendments were motivated by a congressional desire to correct the Commission's understanding and rigid application of that requirement to news programs—a course, in the view of Congress, discouraging meaningful radio and television coverage of political campaigns.[41] The amendments became necessary, as we observed in *Chisholm*, "to enable what probably ha[d] become the most important medium of political information to give the news concerning political races to the greatest possible number of citizens, and to make it possible to cover the political news to the fullest degree." [42] Thus, while reaffirming

connection with the presentation of newscasts, news interviews, news documentaries, and on–the–spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
47 U.S.C. § 315(a) (1976).

**30.** See note 14 *supra*.

**31.** See note 29 *supra*.

**32.** The other three exceptions are candidates' appearances on (1) bona fide newscasts, (2) bona fide news interviews and (3) bona fide news documentaries relegating the candidate to a role merely incidental to the subject of the documentary. See note 29 *supra*.

**33.** See text *supra* at note 26.

**34.** See the discussions in *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 6–7, 538 F.2d at 354–355, and *Aspen, supra* note 7, 55 F.C. C.2d at 708.

**35.** *CBS, Inc.*, 40 F.C.C. 395 (1964).

**36.** *Supra* note 7.

**37.** *Aspen, supra* note 7, 55 F.C.C.2d at 713.

**38.** *Supra* note 7.

**39.** *Chisholm v. FCC, supra* note 7, 176 U.S. App.D.C. at 18, 538 F.2d at 366.

**40.** *Aspen, supra* note 7, 55 F.C.C.2d at 697–698. The *Aspen* interpretation extended to candidates' debates as well as to press conferences. See *id*.

**41.** See *id*. at 698–699.

**42.** 105 Cong.Rec. 14451 (1959) (remarks of Senator Holland), quoted in *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 8, 538 F.2d at 356 (footnote omitted).

its belief that the central mission of Section 315(a) was to serve as a guaranty of equal treatment of candidates for political office,[43] Congress concluded that this objective must be balanced against two others no less vital: encouraging maximum coverage of all news events—whether political or apolitical in nature—in order to cultivate a fully informed public, and preservation of licensees' traditional independent journalistic judgment with respect to broadcasting of such events.[44] To effectuate this revised statutory scheme, Congress inserted the four exemptions from Section 315(a)'s exaction of equal opportunities, and gave the Commission discretion to develop and apply them.[45]

*Aspen* marked the Commission's recognition that its original understanding—that candidates' press conferences were "uses" of station facilities enabling their opponents to demand broadcast privileges for their own purposes[46]—was not congenial with the underlying purpose of the 1959 amendments. That construction, the Commission admitted, had caused an "undue stifling of broadcast coverage of news events involving candidates for public office."[47] Accordingly, the Commission adopted the stance it deemed more in keeping with the legislative aims: that broadcasts of press conferences featuring candidates for political office qualified under Exemption 4 as "on-the-spot coverage of bona fide news events."[48]

We upheld the Commission's new determination in *Chisholm*.[49] To be sure, we did not consider the legislative history of the 1959 amendments dispositive.[50] But we "note[d] that it provide[d] substantial support ... for the Commission's interpretation," and "[u]nder [those] circumstances, we believe[d] it [to be] our duty to defer to the Commission's interpretation of the statute which it is charged with administering."[51] Moreover, we found credible the Commission's declaration in *Aspen* that "*any* appearance by a candidate on the broadcast media is designed, to the best of the candidate's ability, to serve his own political ends."[52] We thus held that the

**43.** "The equal time provision of section 315(a) was designed to assure a legally qualified candidate that he will not be able to acquire unfair advantage over an opponent through favoritism of a station in selling or donating time or in scheduling political broadcast." S.Rep. No. 562, 86th Cong., 1st Sess. 8–9 (1959) U.S.Code Cong. & Admin.News 1959, pp. 2564, 2571. See also *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 10 n.19, 538 F.2d at 358 n.19.

**44.** See *Hearings on H.R. 5389, H.R. 5678, H.R. 6326, H.R. 7123, H.R. 7180, H.R. 7206, H.R. 7602 and H.R. 7985 Before the Subcomm. on Communications and Power of the House Comm. on Interstate and Foreign Commerce,* 86th Cong., 1st Sess. at 1–2 (1959) (statement of Chairman Harris), quoted in *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 10, 538 F.2d at 358; *id.* at 10–12, 538 F.2d at 358–360.

**45.** See *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 8–9, 538 F.2d at 356–357.

**46.** See *CBS, Inc., supra* note 35; *Aspen, supra* note 7.

**47.** *Aspen, supra* note 7, 55 F.C.C.2d at 712.

**48.** *Chisholm v. FCC, supra* note 7, 176 U.S. App.D.C. at 4–6, 538 F.2d at 352–354.

**49.** *Id.* at 18, 538 F.2d at 366. See also *United Church of Christ v. FCC*, 191 U.S.App.D.C. 360,

590 F.2d 1062 (1978), where, contrary to petitioner's reading, we reaffirmed the *Aspen–Chisholm* interpretation of the legislative history of § 315(a) and reiterated the importance of the Commission's developmental role. *United Church of Christ* placed great weight on these considerations, and reminded that "[a]n agency's construction of openended provisions in its statute will prevail unless there are 'compelling indications' that it has misconstrued the law." *Id.* at 366, 590 F.2d at 1068 (footnote omitted). Accordingly, we reaffirmed *Aspen's* extension of Exemption 4 to qualifying press conferences. *Id.* at 367, 590 F.2d at 1069. We also sustained the Commission's ruling "that length of delay [in broadcasting a videotaped event] would be 'a factor in determining the broadcaster's reasonableness and good faith, ... [and that] 'absent unusual circumstances, a delay of more than a day would raise questions' as to the broadcast's eligibility for a § 315(a)(4) exemption." *Id.* at 363, 590 F.2d at 1065, quoting *Delaware Broadcasting Co.*, 60 F.C.C.2d 1030 (1976).

**50.** *Chisholm v. FCC, supra* note 7, 176 U.S. App.D.C. at 9, 12, 538 F.2d at 357, 360.

**51.** *Id.* at 9, 538 F.2d at 357.

**52.** *Id.* at 11, 538 F.2d at 359 (footnote omitted) (emphasis in original).

Commission acted reasonably in rejecting "the degree of control by the candidate, or the degree to which candidates tailor such events to serve their own political advantages,"[53] as a criterion for ascertaining whether the equal–opportunity provision of Section 315(a) had been triggered.[54]

Having so concluded, we faced in *Chisholm* the further question whether the broadcaster's good faith judgment on newsworthiness—the element deemed crucial by the Commission[55]—provided an acceptable measure of applicability of Section 315(a)'s exemptions. At the outset, we noted that this standard came directly from the legislative history of Section 315(a): the chairman of the House Committee had explained during debate that "[i]t sets up a test which appropriately leaves reasonable latitude for the exercise of good faith news judgment on the part of broadcasters and networks...."[56] Although we did not find sufficient authority either in the reports or the debates to substantiate the proposition that Congress intended this to be the sole factor the Commission could utilize in its calculus,[57] we were satisfied that Congress

wished to increase broadcaster discretion as a means of maximizing coverage of campaign activity. Through an examination of other passages in the reports and debates on the 1959 amendments, we learned that Congress had expressed a willingness to grant the Commission considerable leeway in interpreting the exemptions[58] and to accept some risks with respect to the equal–opportunity philosophy in order to achieve more complete broadcast coverage of newsworthy events.[59] Accordingly, we upheld the Commission's revised approach.[60]

### B. The Commission's Analysis and Application of Section 315(a)

■ Petitioner raises four principal objections to the Commission's handling of the statutory issues generated by this litigation. These include its use of *Aspen* and *Chisholm* as controlling precedents, the deference accorded broadcaster discretion, the burden placed on petitioners to demonstrate the absence of good faith on the part of the networks, and the Commission's refusal to consider post hoc "corrective" action.[61] These we now examine in turn.

**53.** *Id.*

**54.** *Id.*

**55.** *Aspen, supra* note 7, 55 F.C.C.2d at 708.

**56.** 105 Cong.Rec. 17782 (1959) (remarks of Representative Harris), quoted in *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 11–12, 538 F.2d at 359–360.

**57.** *Chisholm v. FCC, supra* note 7, 176 U.S. App.D.C. at 12, 538 F.2d at 360.

**58.** See *id.* at 8–12, 538 F.2d at 356–360. We also examined subsequent legislative developments though our analysis of the later historical period, including Congress' inaction in face of the Commission's decision in *CBS, Inc., supra* note 35, proved inconclusive. See *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 12–16, 538 F.2d at 360–364.

**59.** See *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 10, 538 F.2d at 358.

**60.** *Id.* at 18, 538 F.2d at 366.

**61.** Petitioner also vigorously objects to the Commission's alleged failure to treat this case with the "equable dispatch" accorded its *Carter–Mondale* decision. *Carter–Mondale Presi-*

*dential Comm., Inc.,* 74 F.C.C.2d 631, *reconsideration denied,* 74 F.C.C.2d 657 (1979), *aff'd sub nom. CBS v. FCC, supra* note 14. We agree with the Commission that "[t]he precise basis for [these claims] ... is both obscure and misplaced." Brief for Respondents at 26–27. The Commission's ruling in *Carter–Mondale* and this court's decision in *CBS* centered on 47 U.S.C. § 312(a)(7) (1976), which directs broadcasters "to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." Unlike its attack in *Kennedy II, supra* note 17, decided today, petitioner has not invoked § 312(a)(7) in the instant proceeding.

More fundamentally, neither *Carter–Mondale* nor *CBS* supports the notion that the Commission should have undertaken a complete reevaluation of its approach to § 315(a) questions, nor the theory that the Commission should have looked to First Amendment factors or the needs of the candidate in resolving petitioner's § 315(a) contention. Section 312(a)(7) confers a right of "reasonable access" to broadcast facilities, irrespective of any other candidate's use of such facilities, and reasonableness turns on a balancing of considerations to which Congress has attached importance. *Kennedy II,*

### 1. Application of Aspen and Chisholm as Precedents

The first contention advanced by petitioner is that the Commission "woodenly applied" *Aspen* by improperly treating it as establishing a per se rule. Certainly we did not in *Chisholm* approve a per se exemption of press conferences from the equal–opportunity requirement of Section 315(a), nor do we think the Commission attempted to apply *Aspen* in that manner here.[62]

In *Chisholm*, we upheld the Commission's specification of three criteria to govern the decision on whether a candidate's press conference is exempt from the equal–opportunity provision. They are (1) whether the conference is broadcast live, (2) whether it is based upon the good faith determination of the broadcaster that it is a bona fide news event, and (3) whether there is evidence of broadcaster favoritism.[63] It is clear enough that the Commission examined the President's February 13 press conference in each of these respects, and not in the least are we moved to impugn the conclusions the Commission reached.

There is no suggestion that in any instance the press conference was not broadcast live, nor even so much as a whisper of network bias in favor of the President. Both the Broadcast Bureau and the Commission thus correctly perceived the only issue to be whether the networks independently had exercised good faith journalistic

*supra* note 17, text at notes 132–148. As the Commission put it, "[s]uch a 'reasonable access' standard necessarily requires the Commission to take into account competing First Amendment concerns of candidates, the public, and broadcasters." *Commission Opinion, supra* note 5, at 6 n. 11, J.App. 6 n. 11. Conversely, § 315(a) provides a contingent right of access, which automatically vests in legally qualified opponents of a candidate when, but only when, he has made a nonexempt use of broadcasting facilities. As the Commission elucidated:

[T]he exemption under Section 315(a)(4) of "on–the–spot coverage of bona fide news events" requires the Commission only to make determinations with respect to the particular nature of the coverage and news event in question. Nothing in Section 315 and its exemptions calls for consideration by the Commission or a broadcaster of the needs of a candidate requesting equal opportunities. A contingent right of access to "equal opportunities" is self–executing and is mandated for all legally qualified candidates in response to any appearance by an opposing candidate except when that appearance occurs in certain specified exempt program categories. The focus in a case like this is thus necessarily only on the nature of the event and the reasonableness of the broadcaster's treating it as a bona fide news event—not on the individual circumstances of the requesting candidate.

*Id.* at 6–7 n. 11, J.App. 6–7 n. 11.

In sum, no balancing of § 312(a)(7) factors is required under § 315(a). Rather, as we held in *Chisholm, supra* note 7, 176 U.S.App.D.C. at 3, 538 F.2d at 351, and again in *United Church of Christ v. FCC, supra* note 49, 191 U.S.App.D.C. at 362–363, 590 F.2d at 1064–1065, if no evidence is brought forth to indicate that the broadcaster has exhibited favoritism toward a particular candidate or candidates at the ex-

pense of rivals, the Commission need look only to the conditions of the broadcast and whether the broadcaster made a good faith estimate that the event was newsworthy before airing it.

**62.** The Commission said:

While Congress did not specifically discuss appearances by candidates at press conferences, it did contemplate the same type of unrehearsed, unedited broadcast of a candidate's remarks which occurs when a newscaster provides "on–the–spot coverage of a bona fide news event." Obviously, we considered this analogy when we included press conferences within the Section 315(a)(4) exemption in *Aspen*. A candidate being interviewed "on–the–spot" is able, perhaps even likely, to comment negatively on his opponent's campaign or to present erroneously his opponent's positions on the issues. However, so long as the event is considered "newsworthy" in the good faith judgment of the broadcaster, equal opportunity obligations are not incurred.

*Commission Opinion, supra* note 5, at 5, J.App. 5 (footnote omitted).

**63.** See *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 3, 538 F.2d at 351. See also *Aspen, supra* note 7, 55 F.C.C.2d at 703, 708. Importantly for the present case, see Part II–B–4 *infra*, in *Aspen* the Commission also refused to differentiate presidential press conferences on the basis of possible motivation of the candidate in appearing on the program broadcast. The Commission rejected a network's claim that "a distinction must be drawn between those Presidential press conferences called by a President–candidate in furtherance of his duty as Chief Executive to keep the people informed on important national and international issues, and purely political press conferences." *Id.* at 701 (footnote omitted).

judgment in concluding that the event was newsworthy. We move to an examination of the accuracy of the Commission's analysis of this question, and to the objections raised thereto by petitioner.

### 2. Good Faith Determination of a Bona Fide News Event

Petitioner contends that the Commission effectively delegated to the networks its responsibility to determine whether a particular appearance of a candidate is a "use" entitling opponents to equal opportunities. This, petitioner says, the Commission did by attaching too great a weight to the broadcasters' good faith judgment of newsworthiness.[64] The flaw in this argument is that, as we have noted, this criterion proceeds directly from the legislative history of Section 315(a).[65] In Chisholm, we found congressional intent to expand the role of broadcasters under Section 315(a) and to place considerable reliance on the exercise of their journalistic discretion in order to insure attainment of goals viewed as even more important than equal responsive opportunities.[66]

It would be pointless to restate the analysis carefully expounded in Chisholm. It is enough to say that in applying the challenged criterion the Commission pursued the course approved by this court as consistent with the legislative history and objectives.[67] Thus we cannot agree with petitioner that the Commission here engaged in an unauthorized delegation of its statutory functions merely by following Aspen and Chisholm as the guiding precedents. On the contrary, the Commission quite properly honored Chisholm's teaching that "absent evidence of broadcaster intent to advance a particular candidacy, the judgment of the newsworthiness of an event is left to the reasonable news judgment of professionals." [68]

### 3. The Burden of Establishing a Prima Facie Case of Absence of Good Faith

Nor do we believe the Commission acted improperly in requiring a candidate seeking an order affording equal opportunities to come forward with evidence that the broadcaster involved did not exercise a bona fide judgment on newsworthiness in covering an appearance by his opponent.[69]

---

**64.** Of course, not everything is left to the broadcaster's discretion. "[T]he Commission will determine whether a particular scenario falls within one of the classes of appearance exempt under Section 315(a)(1)–(4), and whether a particular broadcast which is claimed exempt was presented using a broadcaster's good faith news judgment." Commission Opinion, supra note 5, at 5, J.App. 5 (footnote omitted).

**65.** See text supra at note 56.

**66.** See text supra at note 44.

**67.** As the Commission said,

ample evidence exists to clarify the plain meaning of the exemptions. The legislative history and Aspen and Chisholm discuss the term "bona fide" at length. The Chisholm court articulated the Commission's position as follows: "absent evidence of broadcaster intent to advance a particular candidacy, the judgment of newsworthiness of an event is left to the reasonable news judgment of professionals." Chisholm, supra, at 359. The court further stated:

Whether broadcaster discretion was intended to be the sole criterion of the bona fide nature of a news event, absent a viola-

tion of the fairness obligation, is less certain, however, and we are unable to reach a definite conclusion from the legislative history. We note only that the thrust of the 1959 amendment was toward increasing broadcaster discretion to cover political news. [Id. at 360.]

As we stated above, we believe that our approach to the news exemptions is consonant to that envisioned by Congress and we find that the Committee has presented no arguments that would cause us to abandon our position.

Commission Opinion, supra note 5, at 5–6, J.App. 5–6 (footnote omitted).

**68.** Chisholm v. FCC, supra note 7, 176 U.S. App.D.C. at 11, 538 F.2d at 359 (footnote omitted). We have already pointed out that petitioner has not sought application of the fairness doctrine. See note 17 supra. Whatever a broadcaster's status with respect to an equal–opportunity claim, he remains bound to the obligations of that doctrine.

**69.** Petitioner asserts that the threshold burden is effectively and impermissibly a preponderance of the evidence. Brief for Appellants at 24, 38. The basis of this contention is the

Petitioner has never even alleged that any of the networks failed to make or abide a good faith estimate of newsworthiness. Petitioner thus is hardly in position to complain that the evidentiary burden defined by the Commission erects an impermissible barrier to complainants attempting to assert rights under Section 315(a). At any rate, to insist upon probable cause as a precondition to administrative investigation of a claim is not at all novel;[70] moreover, one of the expressed objectives of the 1959 amendments to Section 315(a) was to "afford[ ] the licensee freedom to exercise his judgment in the handling of [news] program[s] despite the fact that a legally qualified candidate may appear to be heard on such a broadcast."[71] Requiring a complainant to substantiate his allegations at the outset effectuates this congressional purpose by promoting fearless exercise of the discretion Congress intended broadcasters to have.[72]

Petitioner's apparent inability to satisfy the Commission's threshold burden—allegation and corroboration of either bad faith or nonexercise of judgment on newsworthiness by the networks—does not demonstrate that the standard on this score is improvident. On the contrary, it seems evident that one having a legitimate claim in this regard will ordinarily be able to point to something tending to support it.[73] And we do not doubt that when a prima facie showing is made the Commission, as it has stated, will inquire into the honesty and reasonableness of a broadcaster's professed news judgment.[74]

### 4. Corrective Action

■ Finally, on statutory grounds, petitioner urges that the actual content of a candidate's press–conference broadcast should determine whether the equal–opportunity obligation of Section 315(a) is activated. This contention is linked with the further argument that the Commission erroneously failed to consider post hoc whether remedial action should be taken to miti-

---

Broadcast Bureau's statement that "absent *strong* evidence that broadcasters were not exercising their bona fide news judgment, the Commission will not interfere with such judgments." *Bureau Opinion, supra* note 4, at 4–5, J.App. 11–12 (emphasis supplied). The Commission, however, held that the Bureau's articulation "implied merely that an allegation that a broadcaster was not exercising its bona fide news judgment would be expected to be fully and fairly substantiated." *Commission Opinion, supra* note 5, at 6, J.App. 6.

70. As stated in a somewhat related context, [if] the Commission were to serve merely as a conduit for all charges made against broadcasters under the fairness doctrine, an unfortunate and unacceptable burden would be placed on communications.... The barrier [which the Commission has erected] is the traditional and time–tested device of the *prima facie* case... The requirement that complainants make out a *prima facie* case before the FCC will demand that the broadcaster respond is a sign of humility; it represents a conscious shrinking back ... by a government agency whose regulatory domain overlaps that of the First Amendment.
*American Security Council Educ. Foundation v. FCC,* 197 U.S.App.D.C. 124, 139–140, 607 F.2d 438, 453–454 (1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980) (Wright, C. J., concurring) (footnotes omitted);

see also *NOW v. FCC,* 181 U.S.App.D.C. 65, 73, 555 F.2d 1002, 1010 (1977).

71. S.Rep.No.562, 86th Cong., 1st Sess. 14 (1959), U.S.Code Cong. & Admin.News 1959, p. 2576.

72. In its brief the Commission points out:
While the [agency's] order ... did not address the types of situations where the reasonableness of a broadcaster's judgment might require further scrutiny, several suggest themselves. For example, if the broadcaster had reason to believe in advance that the press conference questions were going to be "rigged" or that the candidate were going to give his routine stump speech and not accept questions, then the broadcaster's treatment of the press conference as a bona fide news event might be called into question. A pre–existing family or business connection between the candidate and the broadcaster might also warrant closer scrutiny of the broadcaster's judgment.
Brief for Respondent at 23 n.16 (emphasis deleted). See also *Bureau Opinion, supra* note 4, at 4, J.App. 11.

73. See note 72 *supra.*

74. See, *e. g., Socialist Workers Party,* 65 F.C. C.2d 234 (Broadcast Bureau 1976); *Chicago Educ. Television Ass'n,* 58 F.C.C.2d 922 (Broadcast Bureau 1976).

gate damage allegedly wrought. It seems much too late to raise these objections, for petitioner never placed a transcript or other recording of the press conference before the Commission.[75] In any event, we are convinced that one of the main purposes of Section 315(a) would be frustrated by requiring the Commission to make subjective judgments on the political content of a broadcast program.[76]

As we have previously observed, a major goal of the 1959 amendments to Section 315(a) was preservation of broadcasters' journalistic judgment on news programming.[77] Congress then decided that when broadcasters are allowed to exercise good faith discretion in evaluating the newsworthiness of candidates' appearances on the four exempted types of broadcast programs, the benefits to the public outweigh the detriments to either the public or the candidates.[78] We think the Commission steers the right course in declining to undertake assessments on the political or nonpolitical nature of a candidate's appearance,

even assuming that there really is much of a difference.[79] As the Commission aptly stated, "to draw such distinctions would require [it] to make subjective judgments concerning content, context and potential political impact of a candidate's appearance," [80] and "[n]either Congress nor the Commission desires to expand governmental oversight of broadcasters' professional journalistic functions." [81]

■ We find eminently reasonable, too, the Commission's reading of Section 315(a) to require broadcasters to appraise newsworthiness prior to broadcast of the questioned event. Were the Commission to hinge operation of the equal–opportunity provision on after–the–fact reexamination of the event broadcast, the purposes for which Congress enacted the Section 315(a) exemptions would largely be set for naught. Broadcasters could never be sure that coverage of any given event would not later result in equal–opportunity obligations to all other candidates; resultantly, broadcaster discretion to carry or not to carry would

**75.** See note 2 *supra*.

**76.** See *Kennedy for President Comm.*, F.C.C. Mimeo No. 30175, at 5–6 (Broadcast Bureau May 15, 1980); *Committee for Fair Broadcasting*, 25 F.C.C.2d 283, 292 (1970).

**77.** See text *supra* at notes 44–56.

**78.** See text *supra* at notes 56–59.

**79.** See note 76 *supra* and note 80 *infra*.

**80.** *Commission Opinion, supra* note 5, at 5, J.App. 5, quoting *Aspen, supra* note 7, 55 F.C. C.2d at 711. The Commission elaborated:

The Committee [contends] that the equal opportunities guarantees of Section 315 should be preserved when an incumbent President makes a "partisan" appearance on a nationally televised news conference. These same sentiments were discussed in Congress in 1959 when it decided to include exemptions to the equal opportunities requirement when candidates appeared in certain news broadcasts. *S.Rep.No.562*, 86th Cong., 1st Sess. 9 (1959) [U.S. Code Cong. & Admin.News 1959, p. 2571.] The Senate Report states that "[t]he equal time provision of Section 315(a) was designed to assure a legally qualified candidate that he will not be able to acquire unfair advantage over an opponent through favoritism of a station selling or do-

nating time or in scheduling political broadcasting." *Id.* It reaffirms its belief in and support for the principle behind Section 315. Nonetheless, Congress acted to exempt appearances by legally qualified candidates on certain news programs from the important Section 315 equal opportunities requirement, recognizing all along the possibility that the interests of political candidates to present their views and the public to be equally informed of all candidates' views might suffer. The amendments were made in the interest of "an informed public"—informed of *the news* in this case, instead of the various candidates' positions. Congress understood that by taking advantage of these exemptions, one candidate (and more likely an incumbent candidate), might receive greater exposure than his or her opponent. In spite of these concerns, Congress felt that broadcasters should not be inhibited in using their journalistic discretion to present the news and other current events programs to the best of their ability. *Id.*, at 14.

*Commission Opinion, supra* note 5, at 4, J.App. 4 (emphasis in original) (footnote omitted). See note 76 *supra*.

**81.** *Commission Opinion, supra* note 5, at 5, J.App. 5.

be seriously if not fatally crippled.[82] These difficulties could impede broadcasting of newsworthy events just as effectively as the Commission decisions which the 1959 amendments were designed to overturn.[83]

■ We also deem irrelevant petitioner's assertion that the questioned press conference was "orchestrated as a partisan political event designed to gain maximum political advantage in the New Hampshire primary and subsequent elections—a fact recognized here and throughout the country if not at the Commission."[84] When we decided *Chisholm*, we fully explained the insignificance of the candidate's motivation in appearing on the broadcast program.[85] We perceive no good reason to reiterate the discussion here.[86]

We thus are unpersuaded by petitioner's statutory arguments. Together they travel several routes, but they all lead to the same destination. In a word, petitioner's objections to the Commission's analysis of Section 315(a) do not warrant reversal of the order under review. We proceed, then, to the constitutional claim.

## III. THE FIRST AMENDMENT CLAIM

Petitioner's First Amendment thesis is that "[p]rivate interests cannot be permitted to abridge the presentation and receipt of legitimate First Amendment expression on the basis of their own subjective values of 'bona fide' news judgment."[87] Taken simply as a general proposition suitable for application in proper context, few if any expectably would disagree. What petitioner thus characterizes, however, is the Commission's deference to the journalistic judgment of broadcasters on newsworthiness of statutorily-exempted events involving candidate appearances, absent some indicium of bad faith or favoritism on the broadcaster's part. In our view, petitioner's legal premise does not fit the situation this case summons us to examine.

■ The First Amendment symbolizes our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[88] Indubitably, "[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we are to follow as a nation."[89] So "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."[90] It does not follow, however, that Senator Kennedy or any other candidate

---

82. Neither the court nor the Commission is unaware of the inevitable media advantage commanded by an incumbent president, but this is a difficulty that may be insoluble so long as complete coverage of all newsworthy events remains the primary objective underlying the statutory scheme. See *Kennedy II, supra* note 17, at n.147.

83. See text *supra* at note 47.

84. Brief for Petitioner at 24.

85. "We remain unconvinced ... that [broadcast] events are distinguishable based on the degree of control by the candidate, or the degree to which candidates tailor such events to serve their own political advantages." *Chisholm v. FCC, supra* note 7, 176 U.S.App.D.C. at 10–11, 538 F.2d at 358–359. As the Commission reminded in the instant litigation, "[t]he focus on the bona fide news judgment of the *broadcaster* was a conscious decision." *Commission Opinion, supra* note 5, at 5, J.App. 5 (emphasis supplied).

86. For the same reason, we reject the argument that the Commission distorted, ignored or omitted petitioner's undisputed factual presentation in considering its equal-opportunity petition. See Brief for Petitioner at 23–24. The assertedly uncontroverted facts relate simply to the President's motivation in calling the press conference.

87. Brief for Petitioner at 38 (emphasis in original).

88. *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 696 (1964).

89. *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659, 685 (1976).

90. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35, 41 (1971).

has a constitutional right of broadcast access to air his views. As the Supreme Court has admonished,

> broadcast media pose unique and special problems not present in the traditional free speech case. Unlike other media, broadcasting is subject to an inherent physical limitation. Broadcast frequencies are a scarce resource; they must be portioned out among applicants. All who possess the financial resources and the desire to communicate by television or radio cannot be satisfactorily accommodated.[91]

Thus "it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." [92]

We believe petitioner looks at the First Amendment aspect of this litigation from the wrong standpoint, for in the area of broadcasting the interest of the public is the chief concern. "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. . . . It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here." [93] From its inception more than a half–century ago, federal regulation of broadcasting has largely entrusted protection of that public right to short–term station licensees functioning under Commission supervision,[94] and with liberty as well as responsibility to determine who may get on the air and when. The history of this era portrays Congress' consistent refusal to mandate access to the air waves on a non–selective basis [95] and, contrariwise, its decision "to permit private broadcasting to develop with the widest journalistic experience consistent with its public obligations." [96] The Commission has honored that policy in a series of rulings establishing that a private right to utilize the broadcaster's facilities exists only when specially conferred.[97] The net of these many years of legislative and administrative oversight of broadcasting is that "[o]nly when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act." [98]

**91.** *CBS v. Democratic Nat'l Comm.*, 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772, 783 (1973).

**92.** *Red Lion Broadcasting Co. v. FCC, supra* note 17, 395 U.S. at 388, 89 S.Ct. at 1806, 23 L.Ed.2d at 388.

**93.** *Id.* at 390, 89 S.Ct. at 1806–1807, 23 L.Ed.2d at 389 (citations omitted).

**94.** See *CBS v. Democratic Nat'l Comm., supra* note 91, 412 U.S. at 103–114, 93 S.Ct. at 2086–2092, 36 L.Ed.2d at 784–790.

**95.** *See id.* at 105–110, 113–114, 93 S.Ct. at 2087–2090, 2091–2092, 36 L.Ed.2d at 785–788, 789–790.

**96.** *Id.* at 110, 93 S.Ct. at 2090, 36 L.Ed.2d at 787–788.

**97.** See, *e. g., Lewis E. Singer*, 47 F.C.C.2d 454 (1974); *Daniel H. Smith*, 44 F.C.C.2d 773 (1974); *Student Ass'n of the State Univ. of New York, at Buffalo, N. Y.*, 40 F.C.C.2d 510 (1973). See also *CBS v. Democratic Nat'l Comm., supra* note 91, 412 U.S. at 113, 93 S.Ct. at 2091–2092, 36 L.Ed.2d at 789–790 and cases cited therein. When applicable Section 315(a), of course, unqualifiedly grants such a right.

See text *supra* at notes 29–30. So does the Commission's "personal attack" rule, which, however, does not extend to candidates for political office. 47 C.F.R. § 73.1920 (1979); see *Red Lion Broadcasting Co. v. FCC, supra* note 17, 395 U.S. at 378, 89 S.Ct. at 1800, 23 L.Ed.2d at 382. The Commission's regulation on "political editorials" affords a responsive right to a candidate or his spokesman. 47 C.F.R. § 73.-1930 (1979); see *Red Lion Broadcasting Co. v. FCC, supra* note 17, 395 U.S. at 378, 89 S.Ct. at 1800, 23 L.Ed.2d at 382. Conversely, the fairness doctrine does not endow any particular individual or group with the option of presenting the contrasting viewpoints required. *Fairness Report*, 48 F.C.C.2d 1, 16 (1974), *reconsideration denied*, 58 F.C.C.2d 691 (1976), *aff'd in part and rev'd in part on other grounds sub nom. NCCB v. FCC*, 186 U.S.App.D.C. 102, 567 F.2d 1095 (1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2060, 56 L.Ed.2d 769 (1978); *Red Lion Broadcasting Co. v. FCC, supra* note 17, 395 U.S. at 378, 89 S.Ct. at 1800, 23 L.Ed.2d at 382; *Kennedy II, supra* note 17, text at notes 173–175.

**98.** *CBS v. Democratic Nat'l Comm., supra* note 91, 412 U.S. at 110, 93 S.Ct. at 2090, 36 L.Ed.2d at 787–788.

While Section 315(a) generally exacts for a candidate's use of broadcast facilities an equal opportunity to his opponents, Congress specifically exempted coverage of a number of arguably "political" news events in the belief that an overly–broad statutory right of access would diminish rather than augment the flow of information to the American public.[99] The real question, then, is whether this legislative scheme transgresses the First Amendment interests of a candidate demanding an opportunity to respond to another candidate's statements on an excepted occasion. We think the answer is evident. As the Commission states, "Congress has chosen to enforce the public's primary right in having 'the medium function consistently with the ends and purposes of the First Amendment' by relying on broadcasters as public trustees, periodically accountable for their stewardship, to use their discretion in insuring the public's access to conflicting ideas."[100] More importantly, the Supreme Court has emphasized that no "individual member of the public [has a right] to broadcast his own particular views on any matter,"[101] rejecting the "view that every potential speaker is 'the best judge' of what the public ought to hear or indeed the best judge of the merits of his or her views."[102] Thus,

> [i]t was reasonable for Congress to conclude that the public interest in being informed requires periodic accountability on the part of those who are entrusted with the use of broadcast frequencies, scarce as they are. In the delicate balancing historically followed in the regulation of broadcasting Congress and the Commission could appropriately conclude that the allocation of journalistic priorities should be concentrated in the licensee rather than diffused among many. This policy gives the public some assurance

that the broadcaster will be answerable if he fails to meet its legitimate needs. No such accountability attaches to the private individual, whose only qualifications for using the broadcast facility may be abundant funds and a point of view. To agree that debate on public issues should be "robust, and wide–open" does not mean that we should exchange "public trustee" broadcasting, with all of its limitations, for a system of self–appointed editorial commentators.[103]

Thus we find no merit in petitioner's First Amendment contention. With the absence also of any valid statutory objection, the order under review is

*Affirmed.*

---

99. See text *supra* at note 44.

100. Brief for Respondent at 25, quoting *Red Lion Broadcasting Co. v. FCC, supra* note 17, 395 U.S. at 390, 89 S.Ct. at 1806, 23 L.Ed.2d at 389 (citation omitted).

101. *CBS v. Democratic Nat'l Comm., supra* note 91, 412 U.S. at 112–113, 93 S.Ct. at 2091, 36 L.Ed.2d at 789, quoting *Report on Editorial-*

izing by Broadcast Licensees, 13 F.C.C. 1246, 1249 (1949).

102. *Id.* at 124, 93 S.Ct. at 2097, 36 L.Ed.2d at 796.

103. *Id.* at 125, 93 S.Ct. at 2097–2098, 36 L.Ed.2d at 796.