829 F.2d 157
 264 U.S.App.D.C. 372, 14 Media L. Rep. 1711
 Sonia JOHNSON and Richard Walton, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Broadcasting Company, Inc., C.B.S., Inc., American
Broadcasting Companies, Inc., Intervenors.
 No. 84-1508.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 21, 1985.
Decided Sept. 22, 1987.
 
 Petition for Review of an Order of the Federal Communications commission.
 John C. Armor, Towson, Md., for petitioners.
 C. Grey Pash, Jr., Counsel, F.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Andrea Limmer and Catherine G. O'Sullivan, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.
 Joseph DeFranco, Washington, D.C., John W. Zucker, New York City and Howard Monderer, Washington, D.C., were on brief, for intervenors, CBS, Inc., and NBC, Inc.
 Carl R. Ramey, Washington, D.C., entered an appearance for intervenor American Broadcasting Companies, Inc.
 Before ROBINSON, EDWARDS and SCALIA*, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 In 1984, feminist-activist Sonia Johnson ran for President as the nominee of the Citizens Party. Richard Walton, a Citizens Party founder and foreign policy author, campaigned as her running mate. Ultimately, they qualified for the ballot in nineteen states, and finished fifth in the election with .08 percent of the vote.[1]
 
 
 2
 On July 24, 1984, Johnson and Walton wrote a series of letters to the League of Women Voters, the three major private networks, and the Public Broadcasting System, requesting inclusion in the League of Women Voters' presidential and vice-presidential debates scheduled for and conducted in the fall of that year.[2] On August 15, they filed a complaint with the Federal Communications Commission against the networks, the Democratic and Republican National Committees, the major party candidates, and the League, asserting upcoming violations of the Communications Act[3] and the First Amendment,[4] and seeking an order that would prohibit the televising of any debate from which they were excluded.[5] The Commission's staff denied the complaint on October 4, 1984;[6] the Commission rejected an application for review of the staff ruling a day later.[7] This petition for review followed.
 
 I. THE PARTIES' CONTENTIONS
 
 3
 Petitioners claim that by 1984 the televised presidential and vice-presidential debates had become so institutionalized as to be a prerequisite for election. If this is the case, they argue, then their exclusion from the 1984 debates would restrict their access to the ballot and impinge upon associational choices protected by the First Amendment. Petitioners cite Terry v. Adams[8] and Anderson v. Celebrezze[9] as instances in which the Supreme Court has struck down action by governmental officials or private individuals that operated to foreclose the political opportunities of candidates and voters. The Commission and intervenors, on the other hand, assert first that there exists insufficient governmental action to establish the predicate for a constitutional violation,[10] and second, that decisions by the Supreme Court and this court on claims to broadcast access under the Communications Act and the First Amendment are dispositive of petitioners' contentions.[11]
 
 
 4
 In considering petitioners' claim, we must remain mindful of the regulatory framework that has evolved under the Communications Act and the decisions evaluating the broadcast-access provisions of the Act. Petitioners' argument essentially boils down to a demand for broadcast access, and access claims based upon various constitutional and statutory theories have been heard by the Supreme Court and this court on a number of occasions.[12] The broadcasting industry stands in a unique relationship to the First Amendment; its tremendous power to inform and shape public opinion and the immutable scarcity of broadcast frequencies have created both tremendous opportunities and serious hazards for free expression. The broadcast-access decisions of the Supreme Court and this court have analyzed comprehensively the many competing First Amendment interests affected by disputes over the control of and access to the airwaves. Congress, and the Commission acting under congressional authority, have responded by crafting an extensive system of government regulation that balances the potentially conflicting speech interests of individuals, broadcasters, and the general public.
 
 
 5
 We therefore first examine petitioners' arguments in the light of the prior cases dealing with First Amendment access claims and the Communications Act. We conclude that the Commission properly determined that petitioners had no right recognized by the Communications Act or the broadcast-access precedents to be included in the televised debates. We then proceed to determine whether the contentions petitioners base upon the ballot-access cases resolved under the First and Fifteenth Amendments raise significant First Amendment issues not adjudicated in earlier decisions. We find that petitioners have failed to show any intrusion upon the electoral process that would require the grant to them of access privileges beyond those conferred by the Communications Act. We therefore affirm the Commission's order.
 
 
 6
 II. THE COMMUNICATIONS ACT AND THE FIRST AMENDMENT
 
 
 7
 In Columbia Broadcasting System v. Democratic National Committee,[13] the Supreme Court upheld a ban on editorial advertising imposed by broadcast licensees, rejecting fairness doctrine and First Amendment challenges. The Court held that claims of First Amendment rights to broadcast access must be examined in light of the regulatory scheme evolved from the Communications Act:
 
 
 8
 Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of great delicacy and difficulty. The process must necessarily be undertaken within the framework of the regulatory scheme that has evolved over the course of the past half century. For, during that time, Congress and its chosen regulatory agency have established a delicately balanced system of regulation intended to serve the interests of all concerned.[14]
 
 
 9
 The Court thus recognized that both broadcasters and the public have important First Amendment interests at stake in controversies over broadcast access. The Court concluded that Congress, by denying the public an unlimited right of access in the Communications Act, and the Commission, in developing the fairness doctrine, had attempted to strike a balance that would satisfy the First Amendment interests of all concerned.[15] While the Court acknowledged that it could not "defer" to the judgment of Congress or the Commission on a constitutional question,[16] it realized that contests over access oftimes present complex problems and few known answers, and that courts ought to pay careful attention to how the other branches of government have treated the same problem.[17]
 
 
 10
 We face a far more pervasive scheme of regulation, and a significantly greater congressional sensitivity when, as here, the First Amendment rights of candidates for public office and their supporters are involved. There is, accordingly, a particularly strong obligation to consider petitioners' claim of a right of access to the broadcast media against the backdrop of the balance of First Amendment interests embodied in the Communications Act, the policies of the Commission, and the caselaw. Candidates are accorded greater access to the broadcast media than other citizens; they are afforded not only a limited privilege of reasonable access[18] but also the right to match any nonexempt use of a broadcasting station by their opponents,[19] and freedom to purchase advertising space at the lowest available rate.[20] These statutory rights of access make clear that Congress intended a wide variety of political views to reach the general public during the course of an election campaign.
 
 
 11
 In a case not involving the broadcast media, the Supreme Court declared that "the primary values of the First Amendment ... are served when election campaigns are not monopolized by the existing political parties."[21] Petitioners' claims rest in part upon fear that the voices of minor party candidates may be drowned out by the superior financial resources of the major parties, or encounter discrimination from conscious or unconscious biases of large broadcasters. However, the several access provisions of the Communications Act ensure that political debate will not be monopolized by one or a very few candiates, but that candidates from all points of the political spectrum will be able to utilize the media.[22]
 
 
 12
 While the Communications Act thus affords candidates several avenues by which to gain television exposure, the televising of a debate sponsored by a non-network third party does not itself trigger access for competing candidates under the provisions of the Act. This is because the Commission, in a decision upheld by this court in Chisholm v. FCC,[23] has determined that debates between qualified political candidates initiated by nonbroadcast entities are exempt from the equal-time requirements of Section 315(a) of the Act.[24] In that case, we found nothing in the Commission's decision inconsistent with the basic philosophy of Section 315(a) as amended by Congress.[25] We concluded that Congress, in crafting the exceptions to the equal-time rule of Section 315(a), intended that the Commission play a large role in fine-tuning the Section 315(a) exemptions.[26] By casting the exemptions in terms of broad categories, Congress knowingly accepted the risk of broadcaster favoritism in order to promote wider coverage of political news.[27]
 
 
 13
 The Chisholm petitioners did not attack the Commission's Section 315(a) policy on First Amendment grounds. That challenge was made in this court in Kennedy I.[28] The question there was whether the legislative scheme embodied in Section 315(a) "transgress[ed] the First Amendment interest of a candidate demanding an opportunity to respond to another candidate's statements on an excepted occasion."[29] We felt then, as we do now, that the answer was evident. We read the Supreme Court's decision in Columbia Broadcasting System v. Democratic National Committee as a holding that " 'no individual member of the public [has a right] to broadcast his own particular views on any matter.' "[30] Congress, we noted, has chosen to protect the public's First Amendment rights in broadcasting "by relying on broadcasters as public trustees, periodically accountable for their stewardship, to use their discretion in ensuring the public's access to conflicting ideas."[31] The Supreme Court had found in Columbia Broadcasting System, we said, that the congressional choice of a public trustee system over a system in which everyone had access to the media was reasonable in view of the scarcity of broadcast frequencies.
 
 
 14
 We can perceive no basis upon which to distinguish the case at bar from Columbia Broadcasting System and Kennedy I. Indeed, petitioners present a far weaker constitutional thesis than the ones those cases rejected. They seek, not general access, as in the former, nor an opportunity to respond to a particular broadcast, as in the latter, but rather the specific right to appear on a specific program--a program not organized by the broadcasters, but by a third party. Thus, viewed in light of the First Amendment balance struck in the statutory scheme, as delineated in the governing caselaw, petitioners have stated no legally cognizable claim to participate in the broadcast debates.
 
 
 15
 In addition, petitioners' demand for inclusion in a particular program raises "the risk of an enlargement of Government control over the content of broadcast discussion of public issues."[32] Petitioners would have the Commission forbid the networks from broadcasting a debate that excluded them.[33] While broadcasters do not have the same First Amendment journalistic freedom as newspapers, Congress and the courts have been reluctant to recognize an unlimited right of governmental interference in the affairs of broadcasters.
 
 
 16
 In rejecting First Amendment challenges by broadcasters to the statutory access scheme, the Supreme Court has consistently emphasized the narrow scope of the restrictions contested.[34] In Columbia Broadcasting System, Inc. v. FCC,[35] the Supreme Court rejected a broadcaster challenge to Section 312(a)(7),[36] which creates for candidates a limited right of reasonable access. The Court held that "the statutory right of access ... properly balances the First Amendment rights of federal candidates, the public, and broadcasters."[37] While it emphasized that "the First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office,' "[38] it underscored the restricted nature of the statutory right:
 
 
 17
 Petitioners are correct that the court has never approved a general right of access to the media.... Nor do we do so today. Section 312(a)(7) creates a limited right to "reasonable" access that pertains only to legally qualified federal candidates and may be invoked by them only for the purpose of advancing their candidacies once the campaign has commenced. The Commission has stated that, in enforcing the statute, it will "provide leeway to broadcasters and not merely attempt de novo to determine the reasonableness of their judgments".... [I]f the broadcasters have considered the relevant factors in good faith, the Commission will uphold their decisions. ... Further, Sec. 312(a)(7) does not impair the discretion of broadcasters to present their views on any issue or to carry any particular type of programming.[39]
 
 
 18
 The access demanded by petitioners in this case, however, would constitute a far greater intrusion on broadcasting discretion than the carefully limited statutory access upheld by the Supreme Court in that case.
 
 
 19
 Similarly, in the seminal case upholding the constitutionality of the fairness doctrine, Red Lion Broadcasting Co. v. FCC,[40] the Supreme Court, while emphasizing that "it is the right of the viewers and listeners, not the right of the broadcasters, which is paramount,"[41] also reiterated that "broadcasting is clearly a medium affected by a First Amendment interest,"[42] and outlined the narrowness of its holding:
 
 
 20
 We need not and do not now ratify every past and future decision by the FCC with regard to programming. There is no question here of the Commission's refusal to permit the broadcaster to carry a particular program or to publish his own view; of a discriminatory refusal to require the licensee to broadcast certain views which have been denied access to the airwaves; of government censorship of a particular program contrary to Sec. 326; or of the official government view dominating public broadcasting. Such questions would raise more serious First Amendment issues. But we do hold that the Congress and the Commission do not violate the First Amendment when they require a radio or television station to give reply time to answer personal attacks in political editorials.[43]
 
 
 21
 We recognize the importance of preserving a large measure of journalistic discretion for broadcasters as a serious First Amendment issue, and this provides additional support for our holding that the Communications Act and the broadcast access cases decided under the First Amendment do not support petitioners' claims to be included in the televised debates.
 
 
 22
 III. THE FIRST AMENDMENT AND ACCESS TO THE BALLOT
 
 
 23
 Petitioners contend, however, that this analysis is thwarted by what they assert as a newly-emergent social fact: that participation in nationally-televised presidential and vice-presidential debates is now a prerequisite to election. They insist, therefore, that their exclusion from the debates effectively excluded them from the ballot and denied voters sympathetic to their cause their First Amendment right to associate through the election and to cast their votes effectively for the candidate of their choice. They rely upon prior decisions of the Supreme Court striking down restrictions on a candidate's access to the ballot as violative of the First or Fifteenth Amendments.
 
 
 24
 Petitioners' First Amendment claims thus differ from those asserted in Columbia Broadcasting System v. Democratic National Committee and the other broadcast access cases. Safeguarding the integrity of the electoral process is a fundamental task of the Constitution, and we must be keenly sensitive to signs that its validity may be impaired. Petitioners' argument, if valid, could affect the balance of First Amendment rights struck in the Communications Act, and might force a reappraisal of competing interests. We need not address questions of that sort, however, for petitioners have not demonstrated a restriction of access to the electoral process that the First Amendment proscribes.
 
 
 25
 In Terry v. Adams,[44] the Supreme Court held that a racially-exclusionary primary held by a private county political organization trespassed upon the Fifteenth Amendment.[45] Black citizens were excluded from voting in primary elections for nominations to county offices conducted by the all-white Jaybird Party. Since the winners of Jaybird Party elections typically ran without opposition in Democratic primaries and general elections,[46] black voters were effectively deprived of meaningful participation in the selection of county officials.[47] No such barrier was present in this case, where voters were not hindered in their ability to cast their votes for petitioners or otherwise take part in the electoral process merely by virtue of petitioners' exclusion from the televised debates.
 
 
 26
 In Anderson v. Celebreeze,[48] the Supreme Court discussed the First Amendment implications of restrictions upon a candidate's eligibility for listing on the ballot. The Court recognized that the First Amendment right of voters to associate and to cast their votes effectively could be "heavily burdened" if candidates were to be excluded from the ballot.[49] Nevertheless, the Court held, not all eligibility requirements established by the states impose constitutionally-suspect burdens on political suffrage.[50] The injury to First Amendment rights, the Court said, must be examined " 'in a realistic light [of] the nature and extent of their impact on voters.' "[51]
 
 
 27
 So scrutinized, it is immediately apparent that exclusion from the televised debates has a far lesser effect than would exclusion from the ballot. The former removes only one of the great number of avenues for candidates to gain publicity and credibility with the citizenry, while the latter drastically restricts voters' ability to choose the omitted candidate. The exclusion of petitioners from the debates did not prevent them from waging an effective campaign or deny voters the opportunity to exercise their First Amendment rights by casting their votes for petitioners. As it was, petitioners were able to gain ballot access in nineteen states, qualify for public campaign financing, and receive enough votes to finish fifth in the field of 228 presidential candidates.[52] Nor did petitioners' nonparticipation in the debates exclude them altogether from television campaigning. The fairness doctrine applied to discussion of the issues, the equal-time rule entitled them to the opportunity to match any nonexempt use of broadcast facilities by their opponents,[53] and as much as any candidate they were entitled to purchase advertising time at the lowest available rates.[54]
 
 
 28
 In Buckley v. Valeo the Supreme Court addressed an analogous situation.[55] Standards governing eligibility for public campaign financing were challenged as an invidious discrimination against third-party candidates, and the ballot-access holdings were urged in support.[56] The Court put these decisions aside:
 
 
 29
 These cases, however, dealt primarily with state laws requiring a candidate to satisfy certain requirements in order to have his name appear on the ballot. These were, of course, direct burdens not only on the candidate's ability to run for office but also on the voter's ability to voice preferences regarding representative government and contemporary issues. In contrast, the denial of public financing to some Presidential candidates is not restrictive of voters' rights and less restrictive of candidates'. [The funding provision] does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions.[57]
 
 
 30
 Petitioners' claims are functionally indistinguishable from the one found lacking in Buckley. Petitioners' supporters were not hindered from casting their ballots for them, nor were petitioners hobbled in waging their campaign. While their inclusion in the televised debates undoubtedly would have benefited their campaign, the Supreme Court has held that the Constitution does not demand that all candidates be subsidized to the point that all are equal in terms of financial strength and publicity.[58] Terry and Anderson were concerned with banishment of candidates and voters from the political arena, not with overcoming disadvantages in money and image frequently encountered by minor-party candidates.
 
 
 31
 We decline petitioners' invitation to embark upon the complex and hazardous task of recasting the First Amendment balance embodied in the Communications Act and the policies of the Commission. We remain mindful that the Communications Act reconciles not only competing policy choices, but also interests of constitutional stature in constant tension with each other. While we will not turn a deaf ear to any plausible assertion of constitutional right, we must be circumspect in any effort to vindicate an alleged constitutional infraction at the expense of constitutional interests at least equally valid and compelling. In the present case, we find the First Amendment interests of candidates, broadcasters and the public adequately served by the adjustments made in the Communications Act, and perceive no basis for disturbing the Commission's denial of petitioners' complaint.
 
 The order under review is accordingly
 
 32
 Affirmed.
 
 
 
 *
 Judge (now Justice) Scalia was a member of the panel at the time this case was argued, but did not participate in this opinion
 
 
 [1]
 Joint Brief for Intervenors CBS, Inc., and National Broadcasting Company, Inc. [hereinafter Brief for Intervenors] at 16-17
 
 
 [2]
 Appendix for Respondent (R.App.) 24-28. On August 30, the request was denied by the League of Women Voters, sponsors of the debate. R.App. 41
 
 
 [3]
 47 U.S.C. Secs. 151-611 (1982)
 4 U.S. Const. amend. 1.
 
 
 [5]
 Appendix for Petitioner (P.App.) E-1, E-5
 
 
 [6]
 Sonia Johnson and Richard Walton, No. 8330-B, C8-405 (Mass Media Bureau, Oct. 4, 1984) (staff ruling), reprinted in 56 Rad.Reg.2d (P & F) at 1534 (Oct. 4, 1984)
 
 
 [7]
 Sonia Johnson and Richard Walton, F.C.C. Docket No. 84-478, 56 Rad.Reg.2d (P & F) 1533 (Oct. 5, 1984)
 Even though the 1984 election is now over, no one has suggested that the case is moot, and we are satisfied that it is not. The issues properly presented, and their effects on minor-party candidacies, will persist in future elections, and within a time frame too short to allow resolution through litigation. This is, therefore, a case where the controversy is "capable of repetition, yet evading review," Storer v. Brown, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714, 727 n. 8 (1974) (quoting Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911)). Accord Anderson v. Celebrezze, 460 U.S. 780, 784 n. 3, 103 S.Ct. 1564, 1567 n. 3, 75 L.Ed.2d 547, 554 n. 3 (1983), and as such may be decided now.
 
 
 [8]
 345 U.S. 461, 469-470, 73 S.Ct. 809, 813-814, 97 L.Ed. 1152, 1160-1161 (1953) (declaring racially exclusionary primary to be violative of the Fifteenth Amendment)
 
 
 [9]
 460 U.S. at 790-795, 103 S.Ct. at 1570-1573, 75 L.Ed.2d at 558-562 (striking down early filing deadline as a restriction on ballot access violative of the First Amendment)
 
 
 [10]
 Brief for Respondents at 24-25; Brief for Intervenors at 5-11. Because we ultimately conclude that petitioners possessed no substantive First Amendment right to be included in the 1984 presidential and vice-presidential debates, we need not determine whether their exclusion by the broadcasters constituted governmental action for First Amendment purposes. See Ripon Soc'y v. National Republican Party, 173 U.S.App.D.C. 350, 361 n. 28, 525 F.2d 567, 578 n. 28 (1975). In Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 188-191, 450 F.2d 642, 649-654 (1971), this court characterized broadcasters' denial of access for political editorial advertisements as governmental action. The Supreme Court reversed Business Executives' on the question of whether the broadcasters substantively violated the First Amendment, but found it unnecessary to resolve the governmental-action question, over which it divided. Columbia Broadcasting Sys. v. Democratic Nat'l Comm., 412 U.S. 94, 114-121, 93 S.Ct. 2080, 2092-2096, 36 L.Ed.2d 772, 790-794 (1973) (plurality opinion finding no governmental action); id. at 139-141, 93 S.Ct. at 2104-2105, 36 L.Ed.2d at 804-806 (concurring opinion finding no governmental action); id. at 146-148, 93 S.Ct. at 2108-2109, 36 L.Ed.2d at 809 (concurring opinions declining to reach question of governmental action); id. at 148-170, 93 S.Ct. at 2109-2120, 36 L.Ed.2d at 809-822 (concurring opinion finding no governmental action); id. at 172-182, 93 S.Ct. at 2122-2126, 36 L.Ed.2d at 823-829 (dissenting opinion finding governmental action). Our sister circuits have generally rejected claims that broadcaster action, at least absent the specific Commission approval here present, qualifies as state action. See, e.g., Massachusetts Universalist Convention v. Hildreth & Rogers, 183 F.2d 497, 501 (1st Cir.1950); Kuczo v. Western Conn. Broadcasting Co., 566 F.2d 384, 387-388 (2d Cir.1977); McIntire v. William Penn Broadcasting Co., 151 F.2d 597, 601 (3rd Cir.1945); Belluso v. Turner, 633 F.2d 393, 398-400 (5th Cir.1980). Following the Supreme Court's lead on this thorny issue, we do not resolve it here
 
 
 [11]
 See Brief for Respondents at 17-24; Brief for Intervenors at 12-17
 
 
 [12]
 See, e.g., Columbia Broadcasting Sys. v. FCC, 453 U.S. 367, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981); Columbia Broadcasting Sys. v. Democratic Nat'l Comm., supra note 10; Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Kennedy for President Comm. (Kennedy I) v. FCC, 204 U.S.App.D.C. 145, 636 F.2d 417 (1980); Chisholm v. FCC, 176 U.S.App.D.C. 1, 538 F.2d 349 (1976)
 
 
 [13]
 Supra note 10
 
 
 [14]
 412 U.S. at 102, 93 S.Ct. at 2086, 36 L.Ed.2d at 783
 
 
 [15]
 Id. at 102, 110-114, 93 S.Ct. at 2086, 2090-2092, 36 L.Ed.2d at 783, 788-790
 
 
 [16]
 Id. at 103, 93 S.Ct. at 2087, 36 L.Ed.2d at 784
 
 
 [17]
 Id
 
 
 [18]
 47 U.S.C. Sec. 312(a)(7) (1982); Columbia Broadcasting Sys. v. FCC, supra note 12, 453 U.S. at 396, 101 S.Ct. at 2830, 69 L.Ed.2d at 729
 
 
 [19]
 47 U.S.C. Sec. 315(a) (1982)
 
 
 [20]
 47 U.S.C. Sec. 315(b) (1982)
 
 
 [21]
 Anderson v. Celebrezze, supra note 7, 460 U.S. at 794, 103 S.Ct. at 1573, 75 L.Ed.2d at 561
 
 
 [22]
 This point may be illustrated by comparing the limited nature of access to electronic campaigning and the lack of regulated access to campaigning by print. Even if endorsement by a prominent newspaper were shown to correlate mathematically to electoral success, the First Amendment not only would not assure access to this successful campaigning forum, but would forbid such an access requirement. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); see also FCC v. League of Women Voters, 468 U.S. 364, 376, 104 S.Ct. 3106, 3115, 82 L.Ed.2d 278, 289 (1984)
 
 
 [23]
 Supra note 12
 
 
 [24]
 47 U.S.C. Sec. 315(a) (1982)
 
 
 [25]
 See 176 U.S.App.D.C. at 18, 538 F.2d at 366
 
 
 [26]
 Id. at 9, 538 F.2d at 357
 
 
 [27]
 Id. at 18, 538 F.2d at 366
 
 
 [28]
 Supra note 12
 
 
 [29]
 204 U.S.App.D.C. at 160, 636 F.2d at 432
 
 
 [30]
 Id., 636 F.2d at 432 (quoting Columbia Broadcasting Sys. v. Democratic Nat'l Comm., supra note 10, 412 U.S. at 112-113, 93 S.Ct. at 2091, 36 L.Ed.2d at 789) (citation omitted)
 
 
 [31]
 Kennedy I, supra note 12, 204 U.S.App.D.C. at 160, 636 F.2d at 432 (quoting Red Lion Broadcasting Co. v. FCC, supra note 12, 395 U.S. at 390, 89 S.Ct. at 1806, 23 L.Ed.2d at 389))
 
 
 [32]
 Columbia Broadcasting Sys. v. Democratic Nat'l Comm, supra note 10, 412 U.S. at 126, 93 S.Ct. at 2098, 36 L.Ed.2d at 797
 
 
 [33]
 P.App. at E-5
 
 
 [34]
 See, e.g., FCC v. League of Women Voters, supra note 22, 468 U.S. at 380, 104 S.Ct. at 3118, 82 L.Ed.2d at 292
 
 
 [35]
 Supra note 12
 
 
 [36]
 47 U.S.C. Sec. 312(a)(7) (1982)
 
 
 [37]
 Columbia Broadcasting Sys. v. FCC, supra note 12, 453 U.S. at 397, 101 S.Ct. at 2830, 69 L.Ed.2d at 729
 
 
 [38]
 Id., 453 U.S. at 396, 101 S.Ct. at 2830, 69 L.Ed.2d at 729, (quoting Monitor Patriot v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35, 41 (1971))
 
 
 [39]
 Columbia Broadcasting Sys. v. FCC, supra note 12, 453 U.S. at 396-397, 101 S.Ct. at 2830, 69 L.Ed.2d at 729 (emphasis in original)
 
 
 [40]
 Supra note 12
 
 
 [41]
 395 U.S. at 390, 89 S.Ct. at 1806, 23 L.Ed.2d at 389
 
 
 [42]
 Id. at 386, 89 S.Ct. at 1805, 23 L.Ed.2d at 387
 
 
 [43]
 Id. at 396, 89 S.Ct. 1809-1810, 23 L.Ed.2d at 392-393 (emphasis added)
 
 
 [44]
 Supra note 8
 
 
 [45]
 See 345 U.S. at 469, 73 S.Ct. at 813, 97 L.Ed. at 1160
 
 
 [46]
 Id. at 463, 73 S.Ct. at 810-811, 97 L.Ed. at 1157
 
 
 [47]
 See id. at 470, 73 S.Ct. at 814, 97 L.Ed. at 1161
 
 
 [48]
 Supra note 7
 
 
 [49]
 460 U.S. at 787, 103 S.Ct. at 1569, 75 L.Ed.2d at 556-557
 
 
 [50]
 See id. at 788, 103 S.Ct. at 1569, 75 L.Ed.2d at 557
 
 
 [51]
 Id. at 786, 103 S.Ct. at 1568, 75 L.Ed.2d at 556 (quoting Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 100 (1972))
 
 
 [52]
 Brief for Intervenors at 16-17 n. 23
 
 
 [53]
 47 U.S.C. Sec. 315(a) (1982)
 
 
 [54]
 47 U.S.C. Sec. 315(b) (1982)
 
 
 [55]
 424 U.S. 1, 94-96, 96 S.Ct. 612, 670-671, 46 L.Ed.2d 659, 730-731 (1976)
 
 
 [56]
 Id. at 93-94, 96 S.Ct. at 670-671, 46 L.Ed.2d at 730-731
 
 
 [57]
 Id. at 94-95, 96 S.Ct. at 670-671, 46 L.Ed.2d at 730-731
 
 
 [58]
 Id. at 97-98, 96 S.Ct. at 672, 46 L.Ed.2d at 732-733